IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

UNITED STATES of AMERICA,

v.            Criminal Case No. 1:15 cr 44

GERALD A. SWIGER,

           Defendant

## MEMORANDUM OPNION AND REPORT AND RECOMMENDATION

### I. PROCEDURAL BACKGROUND

Defendant, Gerald A. Swiger ("Swiger"), was indicted on April 21, 2015. The indictment charges Swiger with: Count One - Felon in Possession of Firearm, to wit: a Taurus .357 caliber revolver and a Davis Industries .22 caliber derringer in violation of 18 U.S.C. §922(g)(1) and 924(a)(2) and with Count Two - "Possession of Unregistered NFA Firearm, to wit: a homemade AR-15 type rifle chambered in .223/5.56mm caliber, which is a machine gun as defined in Title 26, United States Code, Section 5845(b), and which is not registered to him in the National Firearms Registration and Transfer Record" in violation of 26 U.S.C. §5841, 5861(d) and 5871 (Docket No. 1).

Defendant appeared before the Court and pled "not guilty" to the indictment on May 18, 2015 (Docket No. 15).

Defendant filed his Motion to Suppress Physical Evidence (Docket No. 18) and his Motion to Suppress Statements (Docket No 19) on June 5, 2015. The United States filed its response (Docket No. 20) on June 15, 2015.

On June 17, 2015, the Court conducted an evidentiary hearing on the motions at which the Court received the testimony of three witnesses and Exhibits Nos. 1,2,3,and 4. At the conclusion

of the hearing Defendant was given additional time to file a supplemental brief with the Court and the United States was given additional time to file its response. A transcript of the testimonial evidence presented at the hearing was ordered prepared.

The Court received and reviewed Defendant's supplemental brief (Docket No. 24). The Court also requested a responsive brief from the Government. However, the Government did not file the brief by the time that the Court had prepared its Opinion and Recommendation.[1]

The matter is ripe for consideration.

## II.  **CONTENTIONS OF THE PARTIES**

Defendant

1. The Court must suppress statements made by Defendant to Officer Garrett after being placed in custody because he had not been read his <u>Miranda</u> rights.

2. The court must suppress the .22 caliber derringer, marijuana bowl, and knife because there was not a reasonable articulable suspicion that criminal activity was afoot that justified questioning, asking Defendant to exit his vehicle, and conducting a Terry frisk of Defendant.

3. The Court must suppress the .357 caliber revolver, the AR-15 type rifle, the ammunition and all drugs found in the search of Defendant's vehicle because those items of contraband were the fruits of the prior illegal search and un-Mirandized statements

United States

---

[1]The law, as it applies to the facts before the Court, is sufficiently clear to allow the Court to render judgement without considering any further arguments by the Government

2

1. Officer Garrett did not have to have reasonable articulable suspicion to engage Swiger in conversation because the encounter was not incident to a traffic stop.

2. During the encounter, Officer Garrett had reasonable articulable suspicion to ask Defendant to exit his automobile and be subjected to a Terry frisk for officer safety.

3. Once Defendant was placed in custody, the discovery of the revolver, rifle, ammunition and other contraband in the car was inevitable because Officer Garrett was obligated by his department policy to do an inventory search of the car.

4. Suppression of the statements made by Defendant to Officer Garrett once he was placed in custody (handcuffed) is conceded.

## III. RELEVANT FACTS

At approximately 12:57 a.m. on Saturday, August 9, 2014, Swiger parked his green Cavalier in the parking lot of Viola Church (Tr. p. 71), near his home to stay there for the night instead of going to his parents' home (Tr. p. 71). Swiger stated that he originally tried to stay at a friend's house, but that did not work out. Swiger further stated that he was essentially homeless and stayed with his parents when it was raining or if necessary (Tr. p. 75). Swiger did not want to sleep in the driveway of his parents' home because of a bad relationship with his father (Tr. p. 76). Swiger contended that he had elderly parents and thought it was too late for him to go home (Tr. p. 70). He did not want a conflict with his father, with whom Swiger claimed to have a "rough relationship," (Tr. p. 71).[2] Swiger testified he went to Viola Church "and passed out there, where it would be safe,

---

[2] Swiger's parents go to bed early (8:00 pm). His father objects to Swiger coming in after they go to bed and disturbing their sleep by awakening them. To avoid following the rules of his parent's household and the disagreements that follow his breaking those rules, Swiger does not stay at home and is essentially homeless.

3

and I had permission." (Tr. p. 70). He stated he had been given permission to be there from Pastor Krepps (Tr. p. 70-71). Swiger testified that Pastor Krepps had seen him sleeping there before and that this is what had prompted Pastor Krepps to give him permission to stay in the church parking lot or out building when necessary (Tr. p. 71-72) .[3]

Deputy Russell Garrett, a six (6) year deputy with the Marion County Sheriff's Department, testified that he was assigned to road patrol on August 9, 2014 (Tr. p.5). Deputy Garrett stated he was alone patrolling the Prickett's Fort area of Fairmont near the Viola Church (Tr. p. 6). The Viola Community Church sits on the top of a hill near the entrance of Prickett's State Park (Tr. p. 6). It has a fairly large parking lot surrounding it (Tr. p. 31). Swiger's vehicle was parked to the right side of the church, easily seen as one crested the hill (Tr. p. 31).

Viola Church did not have signs prohibiting anyone from parking in the parking lot (Tr. p. 51). There is a gate at the bottom of the hill (Tr. p. 33).

Deputy Garrett stated that, about a month prior to August 9, 2015, he had received information that methamphetamine had been cooked in that area, and that the process to cook it took place in a twenty (20) ounce bottle. He described this as the "shake and bake" method of cooking meth (Tr. p. 7, 45, 48). He had received this information from another Deputy who had heard it from the son of the minister of the church (Tr. p. 46, 51-52). Additionally, Deputy Garrett had been advised: (1) "if you see the gate open there's a possibility that there's somebody here," and (2) that there was not supposed to be anyone there during the hours of darkness (Tr. p. 50). Passage through the gate is necessary in order to get to the church parking lot (Tr. p. 9).

---

[3] Swiger did not have a key to the out building (Tr. P. 72).

4

Deputy Garrett, based on information he had been given[4] that the gate was closed every night, decided he should investigate since he saw the gate open (Tr. p. 52). He was uncertain if, on the day of the arrest: (1) the gate had been closed by someone with the church, (2) the gate had been locked, or whether (3) the gate had been opened by someone with the church (Tr. p. 51-52).

At 3:13 am on August 9, 2014, as he entered the Viola Church's parking lot, Deputy Garrett saw Swiger's green Cavalier parked on the right side of the church (Tr. p. 8). It was immediately visible upon approaching the Viola Church (Tr. p. 8). He was unaware of any reason why someone would be there and stated that he had two concerns: (1) it was a trespasser; and (2) someone may be in the parking lot cooking meth (Tr. p. 8). As such, Deputy Garrett stopped to investigate (Tr. p. 9).

Deputy Garrett parked approximately twenty (20) to thirty (30) feet away, perpendicular from the driver's side to Swiger's car (Tr. p. 10). Although Deputy Garrett testified that Swiger could have attempted to drive away because he did not attempt to block his vehicle, the action of Swiger driving away would have likely caused more suspicion than him staying parked (Tr. p. 10).

Deputy Garrett, in uniform, exited his marked police cruiser and approached Swiger's parked vehicle. (Tr. p. 12). Because it was dark outside, Deputy Garrett used the search lights on his vehicle and a flashlight to get a better view. (Tr. p. 13). Deputy Garrett reported that there may have been a dusk to dawn light from the church as well (Tr. p. 13). Upon first observation, Deputy Garrett noted that the vehicle was parked with no lights on and the engine was not running (Tr. p. 34-35).

---

[4]Deputy Garrett received information that unidentified persons had been cooking meth in the Church parking lot using the one pot - shake and bake - method (Tr. p. 45, 48). He was told the church was closing the gate nightly and that if the police saw the gate open after dark, they should investigate. The information came from the church pastor to his son, a deputy sheriff, who relayed it to Deputy Squire, who relayed it in turn to Deputy Garrett (Tr. p.46, 51-52).

As Deputy Garrett got closer to the vehicle, he observed Swiger, alone, reclined in the driver's seat. Swiger appeared to be sleeping (Tr. p. 11, 35). Swiger was covered by a blanket (Tr. p.13). Swiger did not pull the blanket over himself when he realized someone was tapping on his car window (Tr. p. 39). Deputy Garrett saw a bow and arrows in the passenger seat (Tr. p. 11). Deputy Garrett did not believe West Virginia law considered a bow and arrows to be weapons and did not consider it unusual for a person to have a bow and arrows in plain view in a car (Tr. p. 37-39). Upon closer inspection, Deputy Garrett also saw what appeared to be a camouflage colored assault rifle case that had magazine pouches on the outside of it (Tr. p. 11). The rifle case was on top of other items such as clothing (Tr. p. 11). Swiger appeared to be living out of his car (Tr. p. 43). Deputy Garrett recognized it as an assault rifle case because he had knowledge and training in respect to firearms, and in his eyes, he noted the difference between a rifle case and an assault rifle case[5], to wit: large magazine pouches on the exterior of the case (Tr. p. 12). Deputy Garrett could not see inside the gun case. (Tr. p. 42). Deputy Garrett stated that he assumed that the case contained a firearm, but had no way of knowing this for sure (Tr. p. 42-44). Deputy Garret did not see a twenty (20) ounce bottle, or any other evidence of a methamphetamine lab in the vehicle (Tr. p. 48-49). Deputy Garrett did not know of any prior arrest or seizure of contraband from the Viola Church parking lot and had not been called out or heard of another officer being called out to investigate any particular suspicious activity in the church parking lot (Tr. p. 45-46).

Deputy Garrett proceeded to knock on Swiger's window and identified himself as a police officer (Tr. p. 13). Swiger testified that he immediately identified himself to Garrett and told Garrett

---

[5] Deputy Garrett agreed that it was, however, lawful to own a rifle in the state of West Virginia and that a lot of people in the state likely do.

that he had permission to be there from Pastor Scott Krepps and that the officer could verify that with Deputy John Krepps (Tr. p. 73-74)[6][7]. On cross-examination, Swiger testified that Garrett identified himself, asked Swiger what he was doing there and whether he had any weapons in the car (Tr. p. 78). Swiger testified that he told Garrett "no," meaning he did not have any weapons in the car (Tr. p. 78). Swiger then explained that his statement to Garrett to the effect that he did not have any weapons in the car was not a lie because in his mind guns are tools, not weapons (Tr. p. 78-79, 80-82). Swiger said that Deputy Garrett then asked for Swiger's ID and that Swiger gave that to him (Tr. p. 74). Deputy Garrett testified Swiger rolled down his window and he asked Swiger what he referred to as "standard questions:" "do you have any weapons or drugs?" to which Swiger replied "no" (Tr. p. 14.). Deputy Garrett did not ask Swiger what his name was. (Tr. p. 35). He didn't ask Swiger what he was doing in the church parking lot at that time (Tr. p. 35). He did not ask Swiger to remove the blanket that was covering his body or to move his hands outside of the blanket (Tr. p. 40). In Garrett's view, Swiger did not seem irritable or nervous; did not avert his eyes; did not look down in his car; did not slur his speech; and did not have dilated pupils (Tr. p. 36-37). Deputy Garrett's initial impression was that Swiger was "groggy." (Tr. p. 36).

Because Deputy Garrett felt as though Swiger was lying about not having any weapons based

---

[6]The United States did not call Deputy Garrett back to the stand in rebuttal to the assertions made by Swiger on his direct examination (Tr. p. 82)

[7]A subsequent investigation by Russell Semplice, an investigator for the Office of the Federal Public Defender, indicated that Scott Krepps, pastor of the Viola Church, did give Swiger's mother permission for Swiger to sleep in the church parking lot. (Tr. p. 61-62, 66). However, it should be noted that Pastor Krepps refused to testify and could not be located in order to be served with a subpoena, as such this information has not been corroborated. (Tr. p. 62-63). Further, nothing on the record indicates that Deputy Garrett was aware of the alleged permission on August 09, 2014.

on seeing the bow and arrows and the gun case, he asked Swiger again if he had any weapons.(Tr. p. 53). Swiger replied "no" for a second time. (Tr. p. 15). During these questions, Deputy Garrett saw movement of Swiger's hands under the blanket (Tr. p. 15-16).

After making these observations, Deputy Garrett asked Swiger to get out of the vehicle because he was concerned Swiger might have a weapon under the blanket (Tr. p. 15-16).

Once Swiger was out of the vehicle, Swiger asked Garrett if he was being detained (Tr. p. 16). Deputy Garrett believes he responded by telling Swiger that he needed to pat him down and check him for weapons (Tr. p. 16). Deputy Garrett reports that he could plainly see a knife clip in Swiger's pants pocket which prompted him to ask Swiger again if he had any weapons or controlled substances. Swiger answered, again, that he did not (Tr. p. 16). Deputy Garrett removed the knife from Swiger's pocket: it was a spring operated knife with a 3-5/16th inch cutting edge (Tr. p. 27). Deputy Garrett considered the knife to be a weapon and had the knife been the only weapon, he may not have charged him with a concealed weapon charge (Tr. p. 15-16).[8]

Deputy Garrett then performed a "Terry frisk." While conducting the Terry frisk, Deputy Garrett felt what he thought was a marijuana pipe in Swiger's right front pocket (Tr. p. 18). Deputy Garrett further inquired if Swiger had any marijuana in his pocket, to which Swiger replied "yes maybe a little bit."(Tr. p.18). While retrieving the marijuana pipe, Deputy Garrett felt and removed a .22 caliber derringer firearm (Tr. p 18-19). It was loaded (Tr. p. 21-22). Upon discovering the .22 caliber firearm, Deputy Garrett placed Swiger in restraints (steel handcuffs) (Tr. p. 19). Deputy Garrett stated that he used restraints because: (1) it was a matter of officer safety; and (2) if Swiger

---

[8] During the Motion Hearing, Deputy Garrett agreed that a knife may be common to have in West Virginia.

did not have a concealed weapons permit, he would have been carrying the weapon illegally (Tr. p. 19). At this point in time, Deputy Garrett considered Swiger to be 'in custody' (Tr. p. 19).

After placing Swiger in restraints, Deputy Garrett searched the same pocket in which marijuana pipe was found (Tr. p. 20). In that pocket, he found a plastic bag of green vegetation thought to be marijuana (Tr. p. 20). Again, Deputy Garrett asked Swiger if he had any additional firearms in his vehicle. Deputy Garrett stated that Swiger responded that he did have a handgun (Tr. p. 21).[9] Deputy Garrett could not remember if Swiger had told him about the rifle in the backseat (Tr. p. 22).

Deputy Garrett put Swiger in the back of his police cruiser and again asked Swiger if there were any firearms in the car (Tr. p. 21). Swiger testified he then told Garrett there may be a revolver or a handgun in the car (Tr. p. 21).

Deputy Garrett then called for another officer as well as a tow truck (Tr. p. 22). He felt that it was necessary to have the vehicle towed because Swiger's car was on private property and, at that point, Swiger was going to be arrested and unable to move the car (Tr. p. 22-23). This decision is in accordance with the Marion County Sheriff's Department's policy (Tr. p. 23). Since Deputy Garrett was having the vehicle towed, he stated that he had to inventory the contents (also in accordance with routine practices of the Marion County Sheriff's Department) (Tr. p.23-24). Consequently, Deputy Garrett performed an inventory search of Swiger's vehicle (Tr. p. 23-24).

Mark's Towing arrived to get the car while Deputy Garrett was still performing the inventory search (Tr. p. 24). Deputy Garrett described an inventory search as helpful because it protects both

---

[9] During the Motion Hearing, Deputy Garrett could not remember if Swiger said he "did" have a handgun in the vehicle or that he "might" have a handgun in the vehicle.

the officer and the owner of the property being searched (Tr. p. 24). Additionally, he explained that there was nothing different from this inventory search compared to past ones (Tr. p. 24). No pictures were taken to document what the interior of the vehicle looked like prior to the search (Tr. p. 44). It was during the inventory search that Deputy Garrett found a loaded revolver between the outside driver's seat and floorboard, multiple boxes of ammunition, an AR 15[10] in the rifle case, a small camouflage bag on the passenger seat with what appeared to be controlled substances, a white, powdery substance which field tested positive to be cocaine[11], a notepad which seemed to be a log of possible hunting locations, loose ammunition, rounds from a .357 caliber revolver, an additional marijuana pipe, and brass screens (Tr. p. 25-27).

Swiger was transported to the Sheriff's Office. Once Deputy Garrett returned to the office, he learned that Swiger had already been convicted of carrying a concealed weapon (Tr. 27-28). At this time, Swiger has not been charged for his possession of the marijuana or knife found in his possession at the time of the arrest (Tr. p. 28-29).

## IV. DISCUSSION

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. A seizure occurs when the police restrict a citizen's liberty or movement through physical force or an implicit showing of authority. Terry v. Ohio, 392 U.S. 1, 8, 19 (1968). In essence, the "[t]emporary detention of individuals during the stop of an automobile by police, even if only for a brief period

---

[10] During the Motion Hearing, Swiger defined his AR 15, as well as the revolver a "tool." Furthermore, "each tool has its purpose." Swiger stated that he would use these "tools" on bears, snapping turtles, ground hogs, and coyotes.

[11] Deputy Garrett noted that this has not been confirmed.

and for a limited purpose, constitutes a 'seizure' of 'persons' within the meaning of [the Fourth Amendment]." Whren v. United States, 517 U.S. 806, 809-10 (1996); Delaware v. Prouse, 440 U.S. 648, 653 (1979). This is true "no matter how brief the detention or how limited its purpose." United States v. Branch, 537 F.3d 328, 335 (4th Cir. 2008).

However, it is well established that not all interactions between citizens and police rise to the level of a seizure so as to invoke the protections of the Fourth Amendment. United States v. Jones, 678 F.3d 293, 298-99 (4th Cir. 2012). There are three general types of interactions between the police and citizenry; (1) an encounter; (2) an investigatory stop; and (3) a custodial arrest. Jones; 678 F.3d at 299; Reid v. Georgia, 448 U.S. 438, 440 (1980). Each of these interactions requires a different degree of justification prior to initiation. Id.

A police-citizen encounter requires no justification. Jones, 678 F.3d at 299. An encounter is a consensual interaction in which an officer merely approaches a citizen in a public place and asks the citizen questions. Id. There is no showing of authority in a casual encounter because officer's authority is "no greater than . . . the authority of an ordinary citizen to approach another on the street and ask questions" Id, (quoting United States v. Burton, 228 F.3d 524, 527 (4th Cir.2000)). Due to this lack of authority, the citizen remains free to terminate an encounter at any time and has no obligation to comply with an officer's requests or answer his questions. Id.

The next level of interaction is an investigatory stop in which the officer briefly detains a citizen for the purpose of investigating suspected criminal activity. Reid, 448 U.S. at 440. While an investigatory stop is a seizure, as it curtails a citizen's liberty, it is not as intrusive as an arrest because it lasts for only a brief period of time (only so long as is needed to confirm or deny the suspicion of criminal activity). United States v. Sharpe, 470 U.S. 675, 686 (1985). An officer who

11

conducts such a stop must be able to articulate a "a particularized and objective basis for suspecting the particular person stopped of criminal activity." Illinois v. Wardlow, 528 U.S. 119, 128 (2000). For an investigatory stop to be permissible, the reviewing court must find that a reasonable officer in similar circumstances would have possessed reasonable suspicion that a crime is afoot. Id. To reach such a determination, the reviewing court must look at the totality of the circumstances and "give due weight to common sense judgments reached by officers in light of their experience and training." United States v. Perkins, 363 F.3d 317, 320-21 (4th Cir. 2004). During an investigatory stop, with a reasonable belief that the suspect may be armed and dangerous, an officer may frisk a suspect for weapons. Minnesota v. Dickerson, 508 U.S. 366, 373 (1993). Weapons or nonthreatening contraband found during such a "Terry frisk" may be lawfully seized. Id.

The final and most restrictive interaction is a custodial arrest which occurs when "the suspect's freedom of action is curtailed to a degree associated with formal arrest." Park v. Shiflett, 250 F.3d 843, 850 (4th Cir. 2001) (quoting Illinois v. Gates, 462 U.S. 213, 230–31 (1983)). While an investigatory stop is a restrictive seizure, the seizure only transforms into a custodial arrest when the restriction becomes an indefinite detention, beyond the purpose of simply investigating a suspected crime. United States v. Elston, 479 F.3d 314, 320-21 (4th Cir. 2007). A warrantless arrest for a felony, or a misdemeanor committed in the officer's presence, must be supported by probable cause. Maryland v. Pringle, 540 U.S. 366, 370 (2003).Once a suspect is taken into custody and "subjected to custodial interrogation [he] is entitled to the benefit of the procedural safeguards enunciated in Miranda, regardless of the nature or severity of the offense of which he is suspected or for which he was arrested." Berkemer v. McCarty, 468 U.S. 420, 434 (1984). Therefore, prior to a custodial interrogation, regardless of the location of the interrogation, a suspect should be advised

of the rights to remain silent and have an attorney present during questioning: however, this protection does not extend to basic questions designed to dispel an officer's suspicion during an investigatory stop. Id. at 434-440.

Determining which level of interaction has taken place is a fact-based analysis based upon the totality of the circumstances. Park, 250 F.3d at 850. When determining whether the interaction was a casual encounter or a seizure, the court ought to consider whether a reasonable person would have felt free to terminate the interaction and leave. Jones, 678 F.3d at 299. Factors that a court may consider are; (1) the number of officers present; (2) whether the officers were in uniform or displaying weapons; (3) whether they attempted to touch the suspect, block them in, or restrict their movement; (4) the nature of the questioning; and (5) whether they treated the individual as if they were suspected of an illegal activity, rather than having a routine conversation. Id. at 300. If these factors, in their totality, create a show of force that is so restrictive that a reasonable person would not feel free to end the interaction, the encounter becomes a seizure. Id.

Distinguishing the type of seizure is also a fact-based analysis that examines the totality of the circumstances. Park, 250 F.3d at 850. It should be noted that unlike a casual encounter "the perception that one is not free to leave is insufficient to convert [an investigatory] stop into an arrest." Elston, 479 F.3d at 319 (quoting United States v. Leshuk, 65 F.3d 1105, 1109 (4th Cir.1995)). Instead, the determinative factor is the length of the detention. Id. at 320. An investigatory stop converts into a de facto custodial arrest when the detention lasts longer than needed to confirm or deny the reasonable suspicion. Id.

The question before this Court is two-fold: first, the Court must determine which type (or types) of interaction(s) occurred; second, the Court must determine whether the requisite level of

justification was present to allow for Deputy Garrett to initiate such an interaction.

### A. Nature Of The Initial Interaction Between Deputy Garrett And Swiger

The initial interaction between Deputy Garrett and Swiger is an investigatory stop. Reid, 448 U.S. at 440. At the time that Deputy Garrett approached Swiger, Swiger was sleeping in his car, which was parked on private property. Although he had obtained authorization to park in the church parking lot, Deputy Garrett was unaware that Swiger had obtained such permission. Deputy Garrett approached Swiger's vehicle in a marked police car, dressed in his uniform. Deputy Garrett then approached the driver side window, woke Swiger, shined a flashlight into his window, and immediately questioned him as to whether or not he had weapons. This is a show of the authority that would cause a reasonable person to believe that he is not free to end the interaction. Jones, 678 F.3d at 299.

The case at hand is not dissimilar to the Fourth Circuit's decision in Jones, in which the Fourth Circuit found an investigatory stop rather than a casual encounter. 678 F.3d at 295. The Fourth Circuit came to this determination by relying heavily on the officer's immediate and initial request for the suspect to lift his shirt to show him whether or not he was carrying weapons. Id. at 305. The Fourth Circuit also considered the fact that the officers were in uniform, followed the suspect onto private property in a marked police car, and blocked his car with the patrol car. Id. In essence, the Fourth Circuit determined that a reasonable person would believe that the officer targeted him because he was suspected of engaging in illegal activity, and therefore by its very nature, the suspect would not consider the encounter to be "routine." Id.

The same is true here. Swiger was asleep when he was roused by a fully uniformed Deputy Garrett who pointed a flash light into his automobile and immediately demanded to know whether

or not Swiger was carrying a weapon. Such an interaction cannot reasonably be described as routine or casual, as per the factors set out by Jones. Id. This is unquestionably a show of authority. Id. Any reasonable person in such circumstances would believe that he is suspected of a crime and therefore is not free to leave or refuse to answer the officer's questions. Id. As such, Deputy Garrett's initial interaction with Swiger was an investigatory stop rather than an encounter.

**B. Justification For Seizures**

    **1. Justification For Investigatory Stop**

Deputy Garret was acting appropriately and within his authority in conducting an investigatory stop. As stated, such a stop is appropriate when the officer can articulate "a particularized and objective basis for suspecting the particular person stopped of criminal activity." Wardlow, 528 U.S. at 128. This basis must be examined through the totality of the circumstances and give credence to common sense determinations made by an officer due to their training and experience. Perkins, 363 F.3d at 320-21.

Here, Deputy Garrett was acting based on information that the parking lot of the Viola Church was being used as a location to produce methamphetamine. Further, Deputy Garrett observed that the church's gate and only entry point was open at 3:13 AM on a Friday night into Saturday morning. This could reasonably suggest to Deputy Garrett that someone was, at the very least, trespassing on the property.[12] When Deputy Garrett saw the car and approached it, he did not observe any indication of methamphetamine production. While Deputy Garrett may not have

---

[12]In West Virginia, a trespass is defined as "an unlawful trespass for any person to knowingly, and without being authorized, licensed or invited, to enter or remain on any property, other than a structure or conveyance, as to which notice against entering or remaining is either given by actual communication to such person or by posting, fencing or cultivation." W. Va. Code § 61-3B-3.

15

reasonably believed that methamphetamine was being produced at that point, he did have a reasonable suspicion that Swiger may have been trespassing. Therefore, a brief investigatory stop, to confirm or deny the suspicion of trespassing was not unreasonable; to the contrary, it was lawful. Wardlow, 528 U.S. at 128.

### 2. Justification For Terry Frisk

Furthermore, Deputy Garrett possessed a reasonable suspicion that Swiger may have been armed. Upon approaching the car, Deputy Garrett observed a bow, arrows, and a rifle case within the car. Deputy Garrett also observed Swiger covered by a blanket with his hands obscured from vision, hidden under the blanket. Furthermore, it was after 3:00 AM and Deputy Garrett was alone, void of any backup. In order to ensure his safety Deputy Garrett had to ascertain whether or not Swiger was armed. While Deputy Garrett may not have begun the conversation by asking for Swiger's name or whether or not he had permission to be on the property, at that point Deputy Garrett was reasonably apprehensive that a weapon could be concealed beneath the blanket. As Justice Harlan explained, "a limited frisk incident to a lawful stop must often be rapid and routine. There is no reason why an officer, rightfully but forcibly confronting a person suspected of a serious crime, should have to ask one question and take the risk that the answer might be a bullet." Terry, 392 U.S. at 33 (Harlan, J., concurring).

Deputy Garrett initially attempted to ascertain whether weapons were present by asking Swiger. Although Swiger denied having weapons when asked, Deputy Garrett had observed a rifle case. It is a reasonable inference to assume that where there is a rifle case, there may also be a rifle. In addition, Swiger's hands remained concealed but were moving under the blanket, which led to the reasonable inference that there may be a weapon under the blanket. Therefore, it was not

16

unreasonable to ask Swiger to step out of the car to conduct a frisk. Dickerson, 508 U.S. at 373.

Upon Swiger's exit of the vehicle, Deputy Garrett observed the clip of a knife sticking out of Swiger's pocket. Under the afore described circumstances, a Terry frisk was both reasonable and lawful. Id. Because the frisk was lawful the contraband found in in Swiger's pocket, in addition to the knife (the marijuana pipe and the loaded firearm) was also lawfully seized and is properly admissible. Id.

## C. Admissibility Of Post-Arrest Statements And Seizures

### 1. Post-Arrest Statements

It was at this point that Deputy Garrett, by his own admission, placed Swiger under custodial arrest. Following the arrest, Deputy Garrett questioned Swiger about any remaining firearms in his automobile, which Swiger confirmed were present. However, Swiger had already been placed under custodial arrest and should have been given a Miranda warning prior to any subsequent interrogation. Berkemer, 468 U.S. at 434. Deputy Garrett's failure to advise Swiger of his rights, prior to interrogation, makes any statements that resulted from the un-Mirandized interrogation inadmissible.

### 2. Post-Arrest Seizures

Contrary to the assertion of Swiger, the evidence found in the car is not tainted by the un-Mirandized interrogation. United States v. Sterling, 283 F.3d 216 (4th Cir. 2002). Swiger was arrested prior to the statements. Following the arrest, it was Deputy Garrett's intent to tow Swiger's car off of the private property, which is consistent with his department's policy. However, prior to towing the car, it is routine for the Marion County Sheriff's Department to perform an inventory search.

Inventory searches are commonly performed by police officers on impounded vehicles to

protect the owner's property while it is in the custody of police and to protect the police from claims of theft. United States v. Matthews, 591 F.3d 230, 235 (4th Cir. 2009). Warrantless inventory searches are constitutionally permissible, provided that they are not merely a "ruse" to rummage through one's property in search of incriminating evidence. Florida v. Wells, 495 U.S. 1, 4, 110 S. Ct. 1632, 1635, 109 L. Ed. 2d 1 (1990). However, evidence that is obtained from a lawful inventory search is admissible. Matthews, 591 F.3d at 234-35.

The record reflects and the Court finds by a preponderance of the evidence that inventory searches prior to impound is the policy of the Marion County Sheriff's Department. There is nothing to indicate that the inventory search was a ruse or performed with bad faith to seek out more incriminating evidence. To the contrary, the record indicates that it was routine. Because it is the routine departmental policy of the Marion County Sheriff's Department to conduct an inventory search prior to towing, the car would have been searched regardless of Swiger's un-Mirandized statements. Therefore, the evidence in the car would have been obtained regardless of the statements made by Swiger. As such, even if the Court were to accept that the statements by Swiger make the evidence fruit of the poisonous tree, the evidence is admissible under the doctrine of inevitable discovery.[13]

## V. CONCLUSION

Upon consideration of all of the above, the undersigned United States Magistrate Judge finds that Deputy Garrett possessed a reasonable articulable suspicion of a crime so as to conduct an investigatory stop. Deputy Garrett also possessed a reasonable belief that Swiger was armed and

---

[13] The inevitable discovery doctrine allows for unlawfully obtained evidence to be admissible provided that "the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means." Nix v. Williams, 467 U.S. 431, 444 (1984).

18

therefore a frisk was appropriate. Evidence found on Swiger's body as a result of the frisk was seized lawfully and is admissible.

Deputy Garrett placed Swiger under custodial arrest following the frisk. The statements given by Swiger after being placed in custody are not admissible because they were given without Swiger being advised of his Miranda rights.

Evidence seized from Swiger's car was seized lawfully during a properly conducted inventory search. The evidence would have been inevitably discovered, regardless of Swiger's statements. Therefore, the evidence found in the car is admissible.

Accordingly, Defendant's Motion to Suppress Physical Evidence is denied. Defendant's Motion to Suppress Statements is granted.

## VI. RECOMMENDATION

For the reasons stated herein, it is **RECOMMENDED** that Defendant's Motion to Suppress Statements (Docket No. 19) be **GRANTED** and that all statements made following Swiger's arrest on August 09, 2014 be **SUPPRESSED**.

For the reasons stated herein, it is **RECOMMENDED** that Defendant's Motion to Suppress Physical Evidence (Docket No. 18) be **DENIED**.

Any party may, within fourteen days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should also be submitted to the Honorable Irene Keeley, United States District Judge. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such report and

recommendation. 28 U.S.C. § 636(b)(1); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); Thomas v. Arn, 474 U.S. 140 (1985).

The Clerk of the Court is directed to send a copy of this Report and Recommendation to counsel of record.

Respectfully submitted this 26 day of June, 2015.

JOHN S. KAULL
UNITED STATES MAGISTRATE JUDGE