IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA


UNITED STATES OF AMERICA,

              Plaintiff,

     v.                    //   CRIMINAL NO.  1:15CR44
                                (Judge Keeley)


GERALD A. SWIGER,

              Defendant.


MEMORANDUM OPINION AND ORDER
ADOPTING REPORT AND RECOMMENDATION [DKT. NO. 27],
OVERRULING DEFENDANT'S OBJECTIONS [DKT. NO. 32],
GRANTING MOTION TO SUPPRESS STATEMENTS [DKT. NO. 19], AND
DENYING MOTIONS TO SUPPRESS PHYSICAL EVIDENCE [DKT. NOS. 18, 24]

     Pending before the Court are several motions to suppress filed

by the defendant, Gerald A. Swiger ("Swiger").  These include a

motion to suppress statements, a motion to suppress physical

evidence, and a supplemental motion to suppress physical evidence.

After conducting a suppression hearing, the Honorable John S.

Kaull, United States Magistrate Judge, entered a report and

recommendation ("R&R"), which recommends that the Court grant

Swiger's motion to suppress the statements and deny his motion to

suppress physical evidence.[1]  Swiger objects to several of Judge

Kaull's findings and conclusions.  For the reasons that follow, the

Court **ADOPTS** the R&R, **OVERRULES** Swiger's objections, **GRANTS** the

---

[1] Swiger filed his supplemental motion after the suppression
hearing, and Judge Kaull did not recommend any disposition as to it.

### MEMORANDUM OPINION AND ORDER

---

motion to suppress statements, and **DENIES** the motions to suppress physical evidence.

### I. BACKGROUND

On April 21, 2015, the Grand Jury returned a two-count indictment, charging Swiger with being a felon in possession of a firearm, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2); and possession of a firearm not registered in the National Firearms Registration and Transfer Record, in violation of 26 U.S.C. §§ 5841, 5861(d), and 5871. The charges stem from an interaction between Swiger and Deputy Russell Garrett ("Garrett") of the Marion County Sheriff's Department.

### A. Factual

At the time of the events in question, Swiger was living temporarily with his parents near Pricketts Fort in Marion County, West Virginia, a situation not without problems. As he explained, his parents are elderly and did not appreciate when he would return home after they had gone to bed, usually around 9:00 p.m. On the night of August 8, 2014, Swiger had stayed out well past his parents' bedtime. Around 12:30 a.m., in the early morning of August 9, Swiger became concerned about exacerbating an already "rough" relationship with his father by returning home. Instead,

---

he decided to sleep in his car in the parking lot of a church located on a hill approximately one mile from his parents' house. Allegedly, the pastor of the church had granted Swiger permission to be there, and as Swiger explained, "I just went there because I knew I would be safe there, and no one would bother me." (Dkt. No. 23 at 71).

That morning, Garrett -- a six-year veteran with the Marion County Sheriff's Department -- was patrolling the area around Pricketts Fort. About a month prior, a colleague had advised Garrett that "there may be somebody in the church during the hours of darkness that was in the church that wasn't supposed to be there, possibly cooking methamphetamine, parked in the parking lot." Id. at 7. Garrett's colleague had further advised him that the suspected meth-cooker used the "one-pot method," which involved nothing more than a soda bottle. As Garrett testified, the alleged meth-cook was "[s]omething that I was asked to look into when I was in the area." Id.

On August 9, a few minutes past 3:00 a.m., Garrett was driving in his cruiser when he noticed that the gate to the church parking lot was open. He turned into the parking lot and saw Swiger's vehicle. Garrett later testified that he felt obliged to stop and investigate for two reasons: "[N]umber one, the information I had

3

**MEMORANDUM OPINION AND ORDER**

---

is there's not supposed to be anybody in there at that time of night.  Number two, if there is, they probably could be cooking methamphetamine."  Id. at 9.

Garrett parked his cruiser approximately twenty to thirty feet from Swiger's vehicle, stepped out, and approached Swiger's vehicle with his flashlight shining.  He described his initial observations as follows:

> When I initially approached the vehicle, I saw a male in the front driver's seat, later identified as Mr. Swiger. He appeared to be sleeping.  I saw a bow and arrow in the front passenger seat.  I saw what appeared to be a camouflage color rifle case, assault rifle case; it had magazine pouches on the outside of it in the rear passenger seat.

Id. at 11.  Garrett went on to explain that Swiger was covered by a blanket so that his hands were not visible.

At that point, Garrett tapped on the window of Swiger's vehicle and Swiger awoke.  Garrett later described him as groggy but not nervous.  Shining the flashlight in Swiger's face, Garrett identified himself.  Swiger rolled down the window and the two engaged in a verbal exchange.  Swiger testified that he provided identification to Garrett and told him that the pastor had given

**MEMORANDUM OPINION AND ORDER**

---

him permission to be in the parking lot.[2]  According to Swiger, Garrett then "[w]ent back to the cruiser for a second, came back, and started ordering me out of the vehicle." <u>Id.</u> at 74.

Garrett denied that Swiger told him he had the pastor's permission to be in the church parking lot. <u>Id.</u> at 50.  According to Garrett, during the initial exchange, he asked Swiger standard questions, such as, "if he had any weapons on him, if he has any controlled substance, anything like that that I need to be concerned with." <u>Id.</u> at 14.  As Swiger admitted during cross-examination, "I said no." <u>Id.</u> at 78.  Garrett asked him a second time whether he had any weapons, and Swiger again responded, "No." As Garrett described it:

> [T]he fact that, you know, I can plainly see what I
> believe is a rifle case in there, you know, like I said,
> I believe he was lying to me at this point.  And the fact
> that his hands were moving under his blanket and I
> couldn't see what was going on, at this point I don't
> think I'd asked him his name.  Was much as it was a
> safety concern at this point, I needed to get him out of
> the vehicle where I could see his hands, what he was
> doing with his hands.  So I got him out -- asked him to
> get out of the vehicle, so.

---

[2] According to Swiger, the pastor's son is a Deputy Sheriff with the Marion County Sheriff's Department, and Swiger provided his name to Garrett as a reference.  Also, during the suppression hearing, the investigator for the defense testified that he had spoken with the pastor, who had told the investigator that he had given permission to Swiger to park his car in the church parking lot.

**MEMORANDUM OPINION AND ORDER**

---

Id. at 15.

Swiger then inquired as to whether he was being detained, to which Garrett replied: "I need to pat you down for weapons, and I need to have you out of the vehicle in order to speak with you at this point." Id. at 16. Swiger complied by stepping out of his car, at which point Garrett noticed a knife clip in his right front pocket. Garrett was familiar with knife clips and explained that, "the clip is exposed, basically so you can slide your thumb down in there, grasp it easily so you don't have to stick –- without having to stick your entire hand in your pocket." Id. at 17. He further explained that, because the knife that was attached to the clip was spring-operated and contained a cutting edge three and five-sixteenths inches long, it met the definition of a concealed weapon under West Virginia law. Id. at 27. Garrett's observation prompted him to ask Swiger a third time: "Do you have any weapons or controlled substances on your person." Id. at 17. Swiger again responded, "No." Id.

At that point, Garrett removed the knife from Swiger's pocket and performed a frisk pursuant to Terry v. Ohio, 392 U.S. 1 (1968). During the pat-down, Garrett felt what he believed to be a marijuana pipe in Swiger's pocket. When asked, Swiger reluctantly confirmed that the object was in fact a glass marijuana pipe.

---

Garrett then asked Swiger if he had any marijuana on him, to which Swiger replied, "Maybe a little." Id. at 18.

Garrett then reached into Swiger's pocket to retrieve the marijuana and instantly felt a gun, later identified as a .22 caliber Derringer pistol. Garrett testified that he had experience handling such firearms and was familiar with them. Upon discovering the Derringer, Garrett immediately placed Swiger in handcuffs because, "unless he had a concealed carry permit, he would have been charged with carrying a concealed firearm." Id. at 19. In addition to the Derringer, Garrett also recovered from Swiger's pocket a "plastic bag of green vegetation consistent in appearance with marijuana."[3] Id. at 20.

After Swiger was restrained, Garrett asked him again whether he had any additional weapons in the car. This time, Swiger admitted having "a revolver or a handgun" in the vehicle. Id. at 21. Garrett performed a full search of Swiger's person, placed him in the cruiser, and radioed for back-up. Garrett also called a tow truck and performed an inventory search of Swiger's vehicle.

---

[3] Garrett later confirmed that he intended to charge Swiger with "both possession of marijuana and carrying a concealed weapon." (Dkt. No. 23 at 28-29).

## MEMORANDUM OPINION AND ORDER

---

In the following exchange, Garrett explained why the car needed to be towed:

Q.  Okay, and why was it necessary to have the vehicle towed?

A.  Because it was on private property.  And the vehicle -- the -- initially the information I had was there was not anybody supposed to be there at night.  Here's the gentleman, he is on private property, he is under arrest.  I couldn't very well leave his vehicle there.

Q.  Okay.  Did the -- so when -- was the defendant going to be arrested at that point?

A.  Yes.  Yes, he was.

Q.  All right.  So he was not going to be allowed to drive away in his car?

A.  That is correct.

Q.  And your understanding was that there wasn't supposed to be anybody there, so therefore, he was trespassing?

A.  That is correct.

Q.  And therefore, given that situation, did something have to be done with the car?

A.  Yes.

Q.  And according to your department's policy, what are you supposed to do as an officer in that situation?

A.  Well, we would tow the -- the decision would be made if -- say, if the vehicle -- under these conditions, since he wasn't in fact supposed to be on the property, I had to remove the vehicle from the property.  As far as since I was having the

**MEMORANDUM OPINION AND ORDER**

---

        vehicle towed, I would have had to inventory the
        contents of the vehicle as well, so.

Q.    And did you do that?

A.    Yes.

Q.    Prior to the arrival of the tow truck?

A.    Prior to.  I, again -- yes, and then he probably
        while there was a lot of items in the vehicle, from
        what I recall, and I was probably still
        inventorying it once he arrived.

Id. at 22-24.

    Garrett also elaborated on the inventory search:

Q.    Okay.  Have you conducted inventory searches
        before?

A.    Yes, sir.

Q.    And what you did in this instance, is this
        consistent with what you have done in the past?

A.    Yes, sir, it is.

Q.    Did you do anything differently?

A.    No.

Q.    All right.  And what is the purpose of the
        inventory search?

A.    Basically it is identify items of value that could
        -- basically to protect the owner's right, you
        know, property.  So, tow truck drivers, or
        something, whatever, they are out of our custody,
        the vehicle, items or something of value comes up
        missing, we try to identify it.  And we try to
        identify it and list it on the inventory, so.

Id. at 24.

Finally, Garrett identified the items he recovered during the inventory search:

> Q.    All right.  All right, what did you find during the inventory search?
>
> A.    Well, I found the firearm, the revolver.  It was located in the -- basically between the outside driver's seat and the floorboard.  It was laying on the floorboard.
>
> Q.    And it was loaded?
>
> A.    It was loaded.  I found the -- inspected the green rifle case and located a AR-15.  And there was several magazines -- loaded magazines of ammunition, as well as additional boxes of ammunition.
>
> Q.    Multiple boxes; right?
>
> A.    Yes, I'm -- I don't recall the exact amount, but multiple, yes.
>
> Q.    So?
>
> A.    I found controlled substances in the vehicle in addition.
>
> Q.    What kind?
>
> A.    Well, I found additional marijuana, small quantities.  I don't recall the exact amount.  I found some white powdery rock substance, which field tests positive as cocaine, but it has not

been sent away for testing, so that hasn't been
confirmed.[4]

Q.    Okay.  And inside the case, is that where the boxes
of ammunition were with the rifle inside the case?

A.    Correct, it was all contained within the case.

Id. at 25-26.

### B. Procedural

Following his indictment, Swiger filed the pending motions to
suppress on June 5, 2015.  In his motion to suppress the statements
concerning the presence of firearms in his car, Swiger argues:
"When Garrett questioned Mr. Swiger about any additional firearms,
no Miranda rights had been given.  Thus, Mr. Swiger's statements
about the presence and location of the firearms should be
suppressed."  (Dkt. No. 19 at 4).  In his motion to suppress all
the evidence seized from his person and vehicle, Swiger contends:

> Garrett did not have reasonable suspicion to believe that
> criminal activity was afoot when he decided to order that
> Mr. Swiger exit the vehicle to frisk him . . . .  Based
> on the firearm found on Mr. Swiger, he then went on to
> search Mr. Swiger's vehicle for additional weapons.  Two
> other firearms were uncovered pursuant to this search.
> These two additional firearms are the fruit of the prior
> illegal search and should be suppressed along with the
> handgun that was found on Mr. Swiger pursuant to the
> illegal frisk.

---

[4] Garrett later testified on cross-examination that "I found no
evidence of a meth lab."  (Dkt. No. 23 at 48).

## MEMORANDUM OPINION AND ORDER

---

(Dkt. No. 18 at 6).  Finally, in his supplemental motion, Swiger argues that Garrett lacked the requisite basis to conduct either the initial investigatory stop or the subsequent Terry frisk.

Following a suppression hearing held on June 17, Judge Kaull entered the R&R, in which he reached the following conclusions:

> Garrett possessed a reasonable articulable suspicion of a crime so as to conduct an investigatory stop.  Garrett also possessed a reasonable belief that Swiger was armed and therefore a frisk was appropriate.  Evidence found on Swiger's body as a result of the frisk was seized lawfully and is admissible.
>
> Garrett placed Swiger under custodial arrest following the frisk.  The statements given by Swiger after being placed in custody are not admissible because they were given without Swiger being advised of his Miranda rights.
>
> Evidence seized from Swiger's car was seized lawfully during a properly conducted inventory search.  The evidence would have been inevitably discovered, regardless of Swiger's statements.  Therefore, the evidence found in the car is admissible.

(Dkt. No. 27 at 18-19).

On July 9, Swiger filed his objections to the R&R.  He first contends that "there was no reasonable suspicion to conclude that either a meth lab or a trespassing were occurring on the church property."  (Dkt. No. 32 at 3).  He next objects to Judge Kaull's conclusion that the Terry frisk was justified based on Garrett's reasonable suspicion that Swiger was armed.  Id. at 3.  Third, he objects to Judge Kaull's reasoning that "[i]t is a reasonable

12

---

inference to assume that where there is a rifle case, there may also be a rifle." Id. at 5. Finally, he objects to Judge Kaull's application of the inevitable discovery doctrine to the inventory search because, "[i]f the illegal search and seizure had not occurred, there would have been no reason for a vehicle inventory to have occurred either." Id. at 6.

## II. STANDARD OF REVIEW

In conducting an evidentiary hearing and entering an R&R, Judge Kaull acted in accordance with 28 U.S.C. § 636(b)(1)(B). Therefore, this Court "shall make a de novo determination of those portions of the report or specified proposed findings or recommendation to which objection is made." § 636(b)(1). Moreover, the Fourth Circuit has explained: "A motion to suppress decided by a magistrate is not one of the pretrial matters that may be reviewed by the district court merely for clear error or plain error. Congress' failure to prescribe a 'clearly erroneous' standard of review for suppression motions reinforces the need for the district court to conduct plenary, de novo review of such matters." United States v. George, 971 F.2d 1113, 1118 n.6 (4th Cir. 1992) (internal citation omitted).

## MEMORANDUM OPINION AND ORDER

---

### III. MOTION TO SUPPRESS STATEMENTS

It is well settled that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." Miranda v. Arizona, 384 U.S. 436, 444 (1966). The phrase "custodial interrogation" is defined as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." Id. "The test for determining whether an individual is in custody for Miranda purposes is whether, under the totality of the circumstances, the 'suspect's freedom of action is curtailed to a degree associated with formal arrest.'" United States v. Faucette, 26 F. App'x 91, 91-92 (4th Cir. 2001) (per curiam) (quoting Berkemer v. McCarty, 468 U.S. 420, 440 (1984)).

Here, the government concedes that Swiger was "'in custody' for the purposes of Miranda" when Garrett placed him in handcuffs. (Dkt. No. 20 at 8). Likewise, there is no dispute that Garrett questioned Swiger about the contents of his vehicle after handcuffing him. Accordingly, as the government admits, "any statements that [Swiger] made in response to questions posed by

14

### MEMORANDUM OPINION AND ORDER

---

Garrett after [he was handcuffed] are properly excluded." Id. at 9. Indeed, Judge Kaull reached the same conclusion in his R&R, and the Court adopts his recommendation that Swiger's motion to suppress statements be granted.

### IV. MOTIONS TO SUPPRESS PHYSICAL EVIDENCE

The Fourth Amendment ensures that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ." U.S. Const. amend. IV. Law enforcement's infringement of this right triggers the so-called "exclusionary rule," which "forbids the use of improperly obtained evidence at trial." Herring v. United States, 555 U.S. 135, 139 (2009). Swiger urges application of the exclusionary rule to the physical evidence in this case because he contends that it was discovered "in violation of his rights guaranteed by the Fourth Amendment." (Dkt. No. 24 at 16).

"Our first task is to establish at what point in this encounter [between Swiger and Garrett] the Fourth Amendment becomes relevant." Terry v. Ohio, 392 U.S. 1, 16 (1968). "Generally speaking, a 'seizure' warranting protection of the Fourth Amendment occurs when, in view of the totality of the circumstances surrounding the 'stop,' a reasonable person would not feel free to

**MEMORANDUM OPINION AND ORDER**

---

leave or otherwise terminate the encounter." United States v. Weaver, 282 F.3d 302, 309 (4th Cir. 2002).

> A court considers a number of factors in determining whether an officer's conduct would convey to a reasonable person that he is not free to leave. These include, but are not limited to, the number of police officers present during the encounter, whether they were in uniform or displayed their weapons, whether they touched the defendant, whether they attempted to block his departure or restrain his movement, whether the officers' questioning was non-threatening, and whether they treated the defendant as though they suspected him of illegal activity rather than treating the encounter as routine in nature.

United States v. Jones, 678 F.3d 293, 299-300 (4th Cir. 2012) (internal quotation marks and citation omitted).

Initially, Garrett approached Swiger's vehicle and inspected its contents through the windows, "an act that in no way violated the Fourth Amendment." United States v. Johnson, 599 F.3d 339, 347 (4th Cir. 2010). He then awoke Swiger by tapping on the window, identified himself as a police officer, and asked Swiger whether he had weapons or narcotics. Precedent "make[s] it clear that a seizure does not occur simply because a police officer approaches an individual and asks a few questions." Florida v. Bostick, 501 U.S. 429, 434 (1991).

**MEMORANDUM OPINION AND ORDER**

---

Even under the <u>Jones</u> factors, Garrett's initial questioning of Swiger did not convert the casual encounter into a seizure.[5] Garrett was the only officer present. Although in uniform, he did not display his weapon in any meaningful way, and he made no physical contact with Swiger. Furthermore, he had parked his cruiser approximately twenty to thirty feet from Swiger's car, such that he "wasn't in a position to attempt to block forward motion of the vehicle." (Dkt. No. 23 at 10). Finally, Garrett's initial questions were in no way threatening; he characterized them as "standard under any instance where I come into contact with somebody in a vehicle."[6] <u>Id.</u> at 14.

Indeed, up to this point, Swiger does not contend that any Fourth Amendment violation occurred. (Dkt. No. 24 at 5) ("The Fourth Amendment was not initially implicated when Garrett approached Mr. Swiger's vehicle and observed a sleeping Mr. Swiger."). Garrett's subsequent actions are troublesome from Swiger's perspective, however. When Garrett ordered him to get out

---

[5] The instant case is markedly distinguishable from <u>Jones</u>, in which "two police officers in uniform in a marked police patrol car conspicuously followed Jones from a public street onto private property and blocked Jones's car from leaving the scene." 678 F.3d at 305.

[6] Even if Garrett requested Swiger's identification and processed it in the cruiser, "it does not logically follow that any time an officer retains someone's driver's license that such retention blossoms into an unconstitutional seizure." <u>Weaver</u>, 282 F.3d at 312.

of his vehicle, Swiger argues that "[i]t was then that the seizure [] occurred, and accordingly the officer needed reasonable suspicion to suspect that criminal activity was afoot." Id. at 6. The government concurs that a seizure occurred when Garrett directed Swiger to get out of his car. (Dkt. No. 29 at 2).

## A. **Terry** Stop

In light of the circumstances just described, Garrett's order for Swiger to exit his vehicle provided the additional ingredient that transformed an otherwise innocuous encounter into a "seizure" under the Fourth Amendment. To this extent, the instant case is comparable to the facts confronted by the Fourth Circuit in Santos v. Frederick Cnty. Bd. of Comm'rs, 725 F.3d 451 (4th Cir. 2013). In that case, two uniformed police officers parked their patrol car and approached a suspected illegal immigrant, Santos, who was sitting on the curb. Id. at 457. They inquired about her job and asked her for identification, which she produced. Id. at 458. The officers completed a warrant check that revealed an outstanding Immigration and Customs Enforcement ("ICE") warrant. Id. Santos then asked the officers whether there was a problem, and one of the officers gestured with his hand for her to remain seated on the curb. Id. Santos was eventually arrested and sent to an ICE detention center. Id.

## MEMORANDUM OPINION AND ORDER

---

Santos subsequently filed a civil rights claim against the officers, alleging that they had "violated her Fourth Amendment rights when they seized and later arrested her." Id. In granting the officers' motion for summary judgment, the district court determined that "Santos was not 'seized' for purposes of the Fourth Amendment until Openshaw gestured for her to remain seated . . . ." Id. at 459. On appeal, the Fourth Circuit agreed. "Like the district court, we conclude that the consensual encounter became a Fourth Amendment seizure when Openshaw gestured for Santos to remain seated." Id. at 462. The court explained that the gesture "unambiguously directed Santos to remain seated," and that the gesture "would have communicated to a reasonable person that she was not at liberty to rise and leave." Id. (internal quotation marks and alterations omitted).

Based on Santos, there is little doubt that a seizure occurred when Garrett unambiguously ordered Swiger to get out of the car -- neither Swiger nor a reasonable person would have felt at liberty to ignore the directive by leaving. Thus, Garrett violated Swiger's Fourth Amendment rights unless the seizure was "reasonable."

The reasonableness inquiry depends on the type of seizure that occurred; in this regard, "the Supreme Court has identified three

categories," including consensual encounters, investigative stops, and arrests.  <u>Santos</u>, 725 F.3d at 460.  "Each category represents differing degrees of restraint and, accordingly, requires differing levels of justification."  <u>Id.</u>

At the point when Swiger exited his vehicle, his interaction with Garrett had exceeded the limits of a casual encounter, but no formal arrest had occurred.  Thus, by process of elimination, Garrett's directive for Swiger to exit the vehicle triggered an investigative stop.

"[A]n officer may, consistent with the Fourth Amendment, conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot." <u>Illinois v. Wardlow</u>, 528 U.S. 119, 123 (2000) (citation omitted). Seizures falling into this category of investigatory detentions are "commonly referred to as 'Terry stops.'"  <u>Santos</u>, 725 F.3d at 460. Swiger contends that Garrett lacked a reasonable, articulable suspicion of either trespass or the production of methamphetamine, and that the <u>Terry</u> stop therefore was not justified.

"In assessing a <u>Terry</u> stop's validity, we consider the totality of the circumstances," such that "factors which by themselves suggest only innocent conduct may amount to reasonable suspicion when taken together." <u>United States v. Perkins</u>, 363 F.3d

### MEMORANDUM OPINION AND ORDER

---

317, 321 (4th Cir. 2004) (citations omitted).  "That level of suspicion is considerably less than proof of wrongdoing by a preponderance of the evidence." United States v. Sokolow, 490 U.S. 1, 7 (1989).  And although district courts are instructed to "give due weight to common sense judgments reached by officers in light of their experience and training," Perkins, 363 F.3d at 321 (citation omitted), "an officer's reliance on a mere 'hunch' is insufficient to justify a stop." United States v. Arvizu, 534 U.S. 266, 274 (2002) (citation omitted).

Prior to ordering Swiger to exit the vehicle, Garrett suspected two criminal activities: the production of methamphetamine and trespass.  As to the former, the sole fact supporting any suspicion of meth production was information from another deputy that "we believe there's someone cooking meth in this parking lot." (Dkt. No. 23 at 46).  Garrett had never made an arrest at that location for meth production, he had never seized any meth-related contraband from the parking lot, and he admitted that during the incident in question he found no evidence that Swiger was cooking meth.  Moreover, Swiger was asleep when Garrett approached the vehicle, suggesting that he had not consumed any meth, which has a stimulative effect.  In fact, Garrett acknowledged that Swiger "wasn't acting in a way to suggest [] that

he was using methamphetamine." Id. at 49.  Taking these facts as

whole, the Court cannot find any reasonable, articulable suspicion

of meth production that would justify a Terry stop.

On the other hand, the facts do support the Terry stop

inasmuch as Garrett suspected Swiger of trespassing.  See United

States v. Young, 707 F.3d 598, 605 (6th Cir. 2012) ("[S]uspicion of

trespassing is alone sufficient to support a Terry stop.").

Garrett had received information from his colleague that "there may

be somebody in the church during the hours of darkness that . . .

wasn't supposed to be there."  (Dkt. No. 23 at 7).  He was further

advised, "If you see the gate open, it is supposed to be closed at

night, you should check the area."  Id. at 50.

Around 3:00 a.m., while driving through the area, Garrett

noticed that the gate was ajar.  He then drove into the parking lot

where he came upon an individual sleeping in his car.  Under West

Virginia law,

> [i]t is an unlawful trespass for any person to knowingly,
> and without being authorized, licensed or invited, to
> enter or remain on any property, other than a structure
> or conveyance, as to which notice against entering or
> remaining is either given by actual communication to such
> person or by posting, fencing or cultivation.

W. Va. Code § 61-3B-3(a) (emphasis added).  Because the church had

given notice against entering by erecting a gate, and because that

gate was open at a time when it should have been closed, Garrett's
concern of trespass was not unreasonable.

Nevertheless, as Swiger points out, his investigator was able
to confirm that Swiger had permission to sleep in the parking lot.
However, Garrett stated he had no knowledge of any such permission.
See United States v. Thompson, 234 F.3d 725, 729 (D.C. Cir. 2000)
(emphasizing that the "reasonableness" inquiry requires courts to
view the facts "objectively, that is, from the perspective of a
reasonable police officer").  Even assuming that Swiger actually
informed Garrett about that permission, Garrett's skepticism of
Swiger's self-interested representation would have been reasonable
under the circumstances.  This is especially true given Swiger's
lack of candor when he denied the presence of any weapons.[7]
Therefore, viewing the facts in their totality, Garrett possessed
a reasonable, articulable suspicion that Swiger was trespassing.

## B. **Terry** Frisk

That conclusion, however, does not end the Court's inquiry,
because, in addition to seizing Swiger's person, Garrett conducted
a pat-down search of his clothing.  During the pat-down, or Terry
frisk, Garrett felt what he believed to be a marijuana pipe.  He

---

[7] Bear in mind, Garrett had just seen a bow and arrows in the
passenger seat and a rifle case in the back.

---

asked Swiger whether he had any marijuana on him, to which Swiger responded, "Maybe a little." (Dkt. No. 23 at 18). Garrett then reached in Swiger's pocket to "retrieve those items" and immediately "felt what was later identified as a .22-caliber Derringer." Id. Based on this sequence, Swiger contends that the Terry frisk uncovered "a marijuana bowl and a .22 caliber Derringer pistol." (Dkt. No. 19 at 2).

"[T]o proceed from a stop to a frisk, the police officer must reasonably suspect that the person stopped is armed and dangerous." Arizona v. Johnson, 555 U.S. 323, 326 (2009). Importantly, "[t]he officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." Terry, 392 U.S. at 27. "The reasonable suspicion standard is an objective one, and the officer's subjective state of mind is not considered." United States v. George, 732 F.3d 296, 299 (4th Cir. 2013) (citation omitted). "In determining whether such reasonable suspicion exists, we examine the 'totality of the circumstances,'" remaining mindful that "multiple factors may be taken together to create a reasonable suspicion even where each factor, taken alone, would be insufficient." Id. at 299-300 (citation omitted).

## MEMORANDUM OPINION AND ORDER

---

Here, Garrett, alone on patrol at 3:00 a.m., looked into Swiger's vehicle and observed a bow and arrows, as well as a rifle case. It was not just any rifle case, however. In fact, Garrett described it as an "assault rifle case" with "magazine pouches on the outside of it." (Dkt. No. 23 at 11). This characterization was based on Garrett's experience carrying a similar case, as well as his particularized observations -- including the case's length, shape, and capability for external magazines. Id. Given the presence of these items, Swiger's denial of having any weapons only added to Garrett's suspicion.[8]

Swiger then stepped out of the vehicle, and Garrett saw the knife clip on his pocket. Having previously observed knives with similar clips, Garrett recognized immediately that the exposed clip

---

[8] During the suppression hearing, Garrett testified that, at this point, based on his observations of the vehicle's contents, he had formed the intent to conduct a Terry frisk. Swiger seizes on this testimony in urging the Court not to consider any of Garrett's subsequent observations in its totality of the circumstances analysis. This argument incorrectly assumes that a Fourth Amendment search occurs when a police officer forms the intent to conduct a search, rather than the point at which the officer actually performs it. See Florida v. J.L., 529 U.S. 266, 271 (2000) ("The reasonableness of official suspicion must be measured by what the officers knew before they conducted their search."); see also Bond v. United States, 529 U.S. 334, 338 n.2 (2000) ("The parties properly agree that the subjective intent of the law enforcement officer is irrelevant in determining whether that officer's actions violate the Fourth Amendment. This principle applies to the agent's acts in this case as well; the issue is not his state of mind, but the objective effect of his actions.") (internal citations omitted).

was attached to a knife concealed in Swiger's pocket. He then removed the knife and discovered that it was spring-operated with a cutting edge of three and five-sixteenths inches.

Swiger attempts to compare the instant case to United States v. Neely, 564 F.3d 346 (4th Cir. 2009) (per curiam), and United States v. Powell, 666 F.3d 180 (4th Cir. 2011). A careful review of those cases, however, demonstrates that they are not on point.

In Neely, an officer made a routine traffic stop, ordered the driver to exit the vehicle, and performed a Terry frisk. 564 F.3d at 348. A second officer then watched the driver while his partner searched the inside of the vehicle and discovered a gun. Id. at 349. The district court denied the driver's motion to suppress the gun and the driver appealed, arguing in relevant part that "the search was not a valid protective search under United States v. Holmes, 376 F.3d 270 (4th Cir. 2004)." Id.

The Fourth Circuit reversed the district court's decision because it was "unable to find that [the officer's] search of [the driver's] vehicle was justified under Holmes." Neely, 564 F.3d at 353. Although the officer in Neely had performed a Terry frisk, the relevant search in that case was the protective sweep of the vehicle, which is analyzed under a variant line of cases, most notably, Holmes. There, the Fourth Circuit held:

## MEMORANDUM OPINION AND ORDER

---

> [W]here a suspect is an occupant or recent occupant of a
> vehicle at the initiation of a Terry stop, and where the
> police reasonably believe the suspect may be dangerous
> and that there may be readily-accessible weapons in his
> vehicle, [Michigan v. Long, 463 U.S. 1032 (1983)]
> authorizes a protective search of the vehicle for
> weapons, provided the police harbor a reasonable belief
> that the suspect may gain access to the vehicle at a time
> when that access would endanger the safety of the
> officers conducting the stop or of other nearby --
> including the reasonable belief that the suspect will
> return to the vehicle following the conclusion of the
> Terry stop.

Holmes, 376 F.3d 280.

Neither Holmes nor Neely involves an analysis of whether a pat-down search was lawful. In fact, the Neely panel failed even to discuss Terry or similar pat-down cases. Thus, Neely's relevance is limited to cases involving protective sweeps, making it both legally and factually distinguishable from the instant case.

Swiger's reliance on Powell fares no better. Although the legal issue in that case is the same as the issue here -- whether a Terry frisk was lawful -- the facts are not analogous. In Powell, two officers made a routine traffic stop, and Powell, a passenger in the vehicle, produced his driver's license upon request. 666 F.3d at 183-84. Two more officers then arrived to provide back-up. Id. at 183. One of the officers checked the status of Powell's license via radio and learned that he had

27

"priors" for armed robbery.  Id. at 184.  Based solely on that "caution data," the officers ordered Powell to exit the vehicle, at which point they performed a pat-down search of his clothing.  Id. Powell tried to flee, but the officers caught him.  Id.  They then searched a backpack located next to Powell's seat in the vehicle and uncovered a gun.  Id.  They also searched his person, incident to his arrest, and discovered crack cocaine.  Id.

Powell filed a motion to suppress, which the district court denied because "the officers had reasonable suspicion that Powell was armed and dangerous and were thus entitled to frisk him."  Id. at 182.  Powell appealed, arguing that the officers had "unlawfully patted him down after he exited the Buick because [they] did not have a reasonable basis to suspect that he was armed and dangerous."  Id. at 185.  The government's counter-argument focused almost exclusively on the caution data.  Id. at 187.  In vacating the district court's decision, the Fourth Circuit noted that the officers' "sole basis for frisking Powell was the caution data," and that "the caution data, by itself, is insufficient to establish reasonable suspicion."  Id. at 188.

This case does not involve caution data, which validates the dicta in Powell that "reasonable suspicion is to be determined on a case-by-case basis, and thus one determination will seldom be

useful precedent for another." <u>Id.</u> at 186-87.  Moreover, the four officers in <u>Powell</u> had no reason to suspect the presence of weapons.  In contrast, Garrett, alone in an isolated church parking lot, had just observed a bow and arrows, an assault rifle case with ammunition attached, and a spring-operated knife.  Thus, any comparison of these facts to the facts in <u>Powell</u> is unfounded.

An objective view of the totality of the circumstances in this case leads to the conclusion that a "reasonably prudent man" in Garrett's position would have feared for his safety and reasonably suspected the presence of dangerous weapons.  Therefore, Garrett's <u>Terry</u> frisk of Swiger was lawful, and the fruits of the search will not be suppressed.

### C. Inventory Search

After discovering the Derringer, Garrett formally arrested Swiger by placing him in handcuffs and detaining him in the cruiser.  As Garrett explained, he intended to charge Swiger with possession of marijuana and carrying a concealed weapon.  (Dkt. No. 23 at 28-29).  Once back up arrived and the tow truck was on its way, Garrett performed an inventory search of Swiger's vehicle and discovered an assault rifle, a revolver, and drugs.

In his motion, Swiger contends that the assault rifle and the revolver are "fruit of the prior illegal search and should be

---

suppressed along with the handgun that was found on Mr. Swiger

pursuant to the illegal frisk." (Dkt. No. 18 at 6).

Notwithstanding that argument, Judge Kaull framed the issue as

whether "the evidence found in the car is [] tainted by the un-

Mirandized interrogation." (Dkt. No. 27 at 17). In his

objections, Swiger clarified that he "does not contend that the

evidence found in the car is tainted by the un-<u>Mirandized</u>

interrogation, rather that the evidence seized is fruit of the

poisonous tree and should be excluded." (Dkt. No. 32 at 6). More

specifically, he asserts that, "[i]f the illegal search and seizure

[i.e., the <u>Terry</u> stop-and-frisk] had not occurred, there would have

been no reason for a vehicle inventory to have occurred either."

<u>Id.</u>

     Although an inventory search is a well-established exception

to Fourth Amendment strictures, <u>see</u> <u>United States v. Matthews</u>, 591

F.3d 230, 234 (4th Cir. 2009), the validity of Garrett's inventory

search is not contested.[9] Indeed, Swiger's sole contention is

---

[9] Nevertheless, Garrett's testimony clearly demonstrates that the policy of the Marion County Sheriff's Department calls for routine inventory searches of vehicles that will be towed, and that Garrett performed the search in good faith pursuant to that policy. (Dkt. No. 23 at 23). Consequently, the exception applies. <u>See</u> <u>Matthews</u>, 591 F.3d at 235 ("For the inventory search exception to apply, the search must have been conducted according to standardized criteria, such as a uniform police department policy, and performed in good faith.") (internal citations, quotation marks, and alterations omitted).

that, because the <u>Terry</u> stop-and-frisk was unlawful, so too was the inventory search.  That premise fails, of course, in light of the conclusion that Garrett's <u>Terry</u> stop-and-frisk was lawful. Therefore, the Court adopts Judge Kaull's recommendation to deny the suppression of the physical evidence found in Swiger's vehicle.

### V. CONCLUSION

After a brief casual encounter, Garrett reasonably suspected that Swiger was trespassing in the church parking lot and ordered him to get out of his vehicle.  At that point, Garrett's observations and the totality of the circumstances provided a reasonable basis for a pat-down of Swiger's clothing.  Because the <u>Terry</u> stop-and-frisk was lawful, the exclusionary rule does not apply, and the physical evidence discovered on Swiger's person and in his vehicle is admissible.  For these reasons, the Court **ADOPTS** the R&R, **OVERRULES** Swiger's objections, **GRANTS** the motion to suppress statements, and **DENIES** the motions to suppress physical evidence.

It is so **ORDERED.**

## MEMORANDUM OPINION AND ORDER

---

The Clerk is directed to transmit copies of this Memorandum Opinion and Order to counsel of record and all appropriate agencies.

DATED: July 17, 2015.

/s/ Irene M. Keeley
IRENE M. KEELEY
UNITED STATES DISTRICT JUDGE